37. Councilor Coyne, you reserve three minutes of your time for rebuttal, correct? Yes, Your Honor, three minutes. Okay, you may proceed. Okay, thank you, Your Honor. There are two issues in this appeal. One, claim construction. The fan tip speed of the fan is less than 1,400. UTC submits that the Board construed the term literally, and in doing so, it ignored the express disclosure and teachings of the specification that make it clear that that is not what it means, that it's a boundary condition. And we would cite the Court to Ingray-Smith that the specification cannot be ignored in this manner. Secondly, with respect to obviousness, the Board found, this is claims 10 and 11, the Board, GE offered a number of motivations to combine these two references. But they offered about a half a dozen of them. And the Board made explicit findings that they were not persuasive. The Board then nonetheless proceeded to say that this combination would be a design choice, which is something that this Court has held in numerous prior cases is not sufficient. It's a conclusion, and it is not sufficient under KSR. With respect to the claim construction issue, the Board construed this fan tip speed limitation as fan tip speed of the fan is less than 1,400 feet per second in combination with the other recited limitations, such as those regarding gear ratio and bypass ratio. Well, those are precisely that, other limitations of the claim. The issue we're here today on is the fan tip speed less than 1,400. The Board gave it an interpretation that all the engine had to do was be capable of being somewhere in that range of zero to 1,400 under any operating conditions. Now, under QOZO, the construction must be consistent with the specification. Under NRA Smith, it has to correspond with what and how the inventor described their invention in the specification, and this construction does not. Can you tell me, where do you think that the Board adopted the idea that this claim limitation is satisfied as long as an engine at any point operates below the 1,400? Your Honor, I think it was GE had urged that construction, and they relied on statements made in prosecution history of another application. Where did the Board adopt it? Here's my recollection. My recollection is part of what is I don't know, odd, unusual about the Board decision is that it never actually adopts a construction at all. All it does is reject your position on which, as far as I can tell, you completely hinge your there is no anticipation case that whatever this means, it must be a hard limit. The engine may not go over that. But I didn't see the Board actually saying, here's what this means. Normal operating condition, any time, whatever. For one, at page 13 of the joint appendix, which is the Board's decision, the paragraph above the heading capital B, we do not adopt patent donors' proposed interpretation for purposes of this decision. We interpret the remaining challenge-dependent claims. I guess my problem here is that what follows is not a claim construction. Well, Your Honor, we would agree. We interpret the remaining challenge-dependent claims, which depend from Claim 1, to require a gas turbine engine with a and now it just repeats the claim, fan blade tip speed less than 1400 in combination with the other elements. Well, sure. Right. But that hasn't said one word about what this what it means to have a fan blade tip speed less than 1400, except that it doesn't mean what you say it means. We agree that it's tautological, that it isn't a proper construction of the claim. But when they apply it to the reference, they make it clear that they're treating it as a capability. They specifically cite GE's statements that it's a mere capability, that it can be at any operating condition. And when they apply that, what they left as a construction to the reference, they specifically point that out, that it is capable of, it operates at least at some point during the flight envelope. Tell me if this is wrong. My recollection is that your argument against this claim term being met by, is this HESS? Yes, Your Honor. HESS is a single point, not more than a single point, which is nothing in this very short HESS reference ever says the engine doesn't go above 1400. That is what the board characterized it at, Your Honor, but that is not correct. We also challenged the disclosure of HESS specifically, that HESS is a combination of three different embodiments with a graphic that doesn't, and they specifically say the transmissions on those different embodiments are different transmissions, different size transmissions. And then it provides a cartoon graphic that gives a schematic of a transmission without ever saying it is the one for the ADP engine or the one for the PW8000 engine. That is a conclusion the board drew that is not supported by the evidence. With respect to the claim construction, what the board was looking for is an explicit requirement, and it says this repeatedly at 11, at 12, that it wasn't described expressly enough for the board. But we are long past the point where claim construction is interpreted in that way. We are not looking only at the literal language of the term. We're not looking only for the language of the claim and only if there's an express disclaimer or a redefinition. The court's precedent at this point, and I'd cite the court to trustees of Columbia University where the court has a discussion of the historical evolution of claim construction in this court, where you always consider the specification. That specification, as was said in Phillips, is often the best guide. And what this specification says specifically is it discloses an apparatus and it discloses a method. And it makes it very clear that the way you start the design of this engine is by designating a boundary condition. And that means something very specific to persons of ordinary skill in the art. And that evidence is uncontested. And what you... Can you... Yes. Am I remembering right? Your expert had some reference, I think, in a deposition to this referring to a steady state operating condition. Do you know what I'm talking about? Yes, I do, Your Honor. It featured fairly prominently in the brief. He did make that statement. What do you know? He made it in the context of being asked about corrected fan tip speed. He also made a number of other statements. So, for example, what the board ignored in grappling onto that one qualified statement, it ignored the statements, and I can give Your Honor a list. In the appendix at 5306, paragraph 27, it imposes a maximum fan blade tip speed, full stop. At 5307, paragraph 29, it's present at all operating conditions. At 5308, at paragraph 31, it sets a boundary condition, which is a limit. At 5311, at paragraph 38, fan does not exceed. And it goes on at 5312, 5314, 17. There are a number of statements that Dr. Mattingly gave, about a dozen of them, where he made it very clear that this is a speed limit. It's a maximum. That's what a boundary condition means. And what the board did is latched onto one qualified statement while ignoring this dozen of other statements from the portions I read up through paragraph 53, which make it clear that it is a speed limit. And he's not alone. We asked Dr. Abari about that as well. And if you would look at the testimony of Dr. Abari, which shows up at the appendix at 5173, down through about 5187, there are some very specific questions I asked him. You consider fan tip speed to be part of the boundary conditions. I consider this to be one of the elements that you use to define the operational condition. I asked him, so the boundary condition is a limit. He answered, it's a limit. And then he goes on to qualify his answer. But he says, point blank, it is a limit. Is the fan tip, so we asked him again, is the fan tip speed a limit? And he said, the fan tip speed's a condition. Now, he didn't want to admit that it was a hard speed limit. He drew the qualification between a hard and a soft speed limit, which is pretty much meaningless. We have both experts agreeing, one of ordinary skill in the art would understand a boundary condition of fan tip speed to be a limit, a maximum fan tip speed. If we had described, this is an apparatus claim we're in front of you today on. The method claim specifically says, in the design process, I'm going to set a boundary condition. The specification says it repeatedly at column one, at column five. The specification specifically says in column one, I'm sorry, column one at lines 49 to 50, the fan tip speed is less than 1400 feet per second. Improving, this is at column five, lines 50 to 53. Improving the performance of the gas turbine engine begins by determining fan tip speed boundary conditions for at least one fan blade of the fan 36. And what is critical here is to define the speed of the tip of the fan blade. So what we've included in the apparatus claim is an apparatus, a product description that says I have a fan that has a speed limit. What we included in the method claims that are not before you is I'm going to design a fan by imposing a boundary condition. And like I said, one of ordinary skill in the art would understand that that means a speed limit, a maximum. And that is what this invention is. That's what the inventors describe the invention as in the specification. And for the board to give it a tautological, literal interpretation ignores how the inventors themselves described their invention. What the board said specifically is, we find no clear link. Well, Your Honor, the portion I just read to define the speed of the tip of the fan blade is a clear link. We respectfully disagree with the board's conclusion in that regard. It couldn't be clearer. They're telling you that it is the speed limit. At best, all I can say about the board's interpretation is it's too parsimonious. It is not looking at the specification fairly, reasonably, and reading it as the inventors described their own invention. Do I take it you don't give any particular significance to the fact that I think in the principal claim we've been focusing on, at one point, maybe the first place, that fan blade tip speed has the word, has the indefinite article in front of it, and later it has a definite article in front of it, which for a term like speed is at least I find a little bit funny that those two different articles would be used because speed is a momentary property that changes from moment to moment so that the indefinite article would tend to suggest all by itself that it just has to have one of those at some point, and later the claim says the fan tip, fan blade tip speed, suggesting it's really not a momentary property of the tip of the fan. I guess we are not putting weight in that, your honor. What we're putting weight in is the way the inventors described the invention, namely I'm going to set a design parameter. That's what's going to enable me to design this geared turbofan engine, and it's got to be a speed limit. All the blades will have the same speed. The fan blade tip speed, that's central to the case and even to the argument this morning. But apparently the only terms that were construed were gear ratio and bypass ratio was fan blade tip speed. Was it construed on claim one, which later was abandoned or? No, your honor. Any construction at all with respect to a fan blade tip speed of a fan less than 1400 feet per second? I think the board construed all three in its institution decision. If you look at the appendix at six, there's a reference to the three terms. I'm looking at that. Just as we interpreted the following terms, gear ratio and bypass ratio. I just. Well, then the next sentence continues on. It says we are also not persuaded that the fan blade tip speed of less than 1400 feet per second as recited in claim one is a speed limit, which is what we had argued in our POPR. OK, I don't see that as a construction, just as a conclusion or a finding, perhaps. Does that make any difference? I don't think it does, your honor. As a practical matter, I think what's on appendix at 13, although I agree with Judge Gerardo, it's not construction as we would expect one. It's just a tautological statement of what the limitation says. But that's how they applied it. They applied it as if that were the. I see that I'm well into my rebuttal time, your honor. I would like to reserve the rest of it to respond to my colleagues comments. Councilor Desai, let me proceed. Good morning, your honors. May it please the court. With respect to the anticipation ground, the appeal here is entirely about claim construction. I disagree with Mr. Coyne's statement that there was an appeal here about the board's factual findings regarding the Hess reference that is not found anywhere in UTC's brief. UTC, in fact, does not dispute any of the findings regarding the Hess reference, including that Hess explicitly discloses a fan blade tip speed of 1060 feet per second. So the board here, in our view, was correct to reject UTC's proposed construction, requiring that the fan blade tip speed be less than 1400 feet per second at all times during engine operation. That's the construction that the UTC proposed, and the board reject that. And in rejecting that construction, the board really just gave the claim its plain meaning. I think that's the issue here. It didn't propose a construction, said this is the plain language of the claim. It doesn't require that the fan blade tip speed be less than 1400 feet per second at all times during operation. And there are really two layers to UTC's claim construction argument. The first is that it wants to construe the fan blade tip speed limitation to be a boundary condition. But that term is found in the specification, but it's used in other claims, other method claims that are not at issue here. And then second, the second layer of the argument is that UTC relies on expert testimony to argue that a boundary condition is one that applies at all times during engine operation. So the board was correct. It evaluated the specification. It didn't ignore the specification. And it said here, the specification does not allow us to import the boundary condition language into the claim. And then importantly, the board weighed the expert testimony and said we've looked at the expert testimony and the expert testimony here doesn't tell us that a boundary condition is one that applies at all times during operation. What is your expert testimony or other basis for interpreting this boundary condition language or understanding it as something other than a hard limit? So there's the expert testimony from Dr. Mattingly that the board relied on on page 12 and 13 of this decision, where first... Mattingly is their guy. ...is their expert. And the board did not cite... Do you still have a bar here? We do. OK. So our expert, Dr. Bari, did testify on this issue. The board did not cite that testimony in its decision, but it does support the board's decision. And that would be at Appendix 5187 5188. And Dr. Bari there confirmed exactly what Dr. Mattingly was saying was that a boundary condition is not a maximum that applies at all times during operation. And what he testified to is that a boundary condition and a fan tip speed, for example, it is a parameter that's used to set optimum conditions to improve the performance of the engine. But all engines can exceed those conditions, those boundary conditions, because there are situations where the engine needs to operate at higher speeds. There's necessity. Necessity can involve exceeding boundary conditions. For example, emergency conditions. That testimony from Dr. Bari is not referenced by UTC at all, but it does support the board's decision. And did you say not referenced by the board? It is not referenced by the board as well. The board relied exclusively on Dr. Mattingly's testimony. A steady state line. Exactly, a steady state. But there were actually two parts to Dr. Mattingly's testimony. The first was we asked him at his deposition, does the fan tip speed range, is that something that applies during the design process or to an actual engine? And he said clearly, it's for the design process, not an actual engine. So it's not a limit that applies during all engine operating conditions. And then, of course, he qualified during his deposition. We asked him, what is this maximum fan tip speed? And he qualified. He says, well, it's a maximum for steady state operation. That qualifier by Dr. Mattingly means that it is not a maximum for non-steady state operations. Exactly what Dr. Abari was talking about for the engine necessitates, for example, emergency conditions, a non-steady state. So the bottom line is the board looked at the expert testimony and made a factual finding. Do you think that the board actually adopted a construction? I think the board gave the claim term its plain meaning. I don't think the board gave an express construction. What is the plain meaning? That you have? I would find it hard for you to say that this notion of steady state or something is a plain meaning. Right. I don't think the board... It's certainly not capable of operation at any given time. That's different from steady state. I think the board gave the plain meaning of the claim, at least in our view, is that you have an engine that operates at a fan tip speed less than 1400 feet per second. Won't all engines do that when they're just starting up? Well, I think that goes to the issue... Making it chronological. That goes to the board's construction and bypass ratio and saying that these parameters are related. Because, for example, when you're spooling up the engine, and this was conceded by UTC at the oral hearing, when you're spooling up the engine, it doesn't have a bypass ratio. Right. So even though you may have a fan tip speed of 50 feet per second and you're sort of incrementally increasing it very fast, at that point in time, you don't even have a bypass ratio. So you will not have an engine that has a bypass ratio between 11 and 22 and a fan tip speed less than 1400 feet per second. So that was the context for the board's decision. Where's the board's explanation of that point? Namely that you can pretty much ignore the extremely slow tip speed except at times when the bypass ratio meets the other claim limitations and you won't universally get the extremely slow tip speed out of any engine when you have that bypass ratio. The claimed bypass ratio. You know, I don't recall exactly if it's in the board's decision. I do remember at the oral hearing, and it's cited in our papers, the fact that this goes to the issue of whether the limitation is rendered meaningless, which is the argument. And that was at appendix 1032-1033 where the board asked the questions of UTC at the hearing about whether spooling up would actually fall within the scope of this claim. And we believe it was conceded by UTC that it would not. And that was at 1032-1033. Why is that? Because there's no airflow at the spooling up stage? Exactly. You only have a bypass ratio of 11 to 22 means you have to have a certain mass flow going through the bypass duct over the mass flow through the core. And if you're spooling up, you don't have sufficient mass flow through the bypass duct, and therefore you're not going to have a bypass ratio between 11 and 22. Does your underlying evidence say one way or the other, whether admittedly, if the engine is not running, there's not much air coming in, but I would think there wouldn't be much air coming in either to the core or to the outside of the core Is there something that explains that? And the only thing the claim cares about is the ratio. Is it that the ratio changes according to how much total air is hitting the front of the nacelle? Right. So the bypass ratio is the mass flow through the bypass duct divided by the mass flow through the core. Does the ratio change according to how much? It will change over the operating conditions of the engine. But the principal point is during spooling up, which was sort of the argument that UTC made about this limitation being meaningless, there is no bypass ratio because you haven't produced sufficient mass flow through the bypass duct. And especially in this instance where they're claiming a bypass ratio of 11 to 22. So you have to have a significant amount of flow through the bypass duct to get to that ratio. Let me quickly address again, the issue, I think the principal issue in UTC's brief was that this, if you don't construe this claim term, if you don't revise this claim to say that it's at all times during engine operation, you're going to render this term meaningless. And we disagree. Again, for the purposes of prosecution with a related application, UTC took the exact opposite position. So I don't think sitting here today UTC can say that a fan blade tip speed is less than a certain number must be construed to be a maximum at all times. Otherwise it's meaningless because it told the office the exact opposite during prosecution of a very similar application. Also, I think this is important too. The board here just gave the term it's plain meaning. And the cases that UTC- I just want to clarify something. I guess I keep thinking I'm dubious about the proposition that the board gave the term it's plain meaning, but I'm not sure that your argument depends on accepting that proposition as opposed to the board rejected the hard limit idea. In the absence of the hard limit idea, there is no contention that Hess is missing it. I agree with the latter point. In the absence of a hard limit, there is no contest here because Hess discloses a fan tip speed of 1,060 feet per second. So with respect to whether the term is rendered meaningless, I think the key point there is that the cases that UTC cites were in issues where the court had construed a claim and had made the term nonsensical or rendered it or vitiated the claim limitation. Here, UTC chose to write this claim as it is. And if it wanted a different claim in the board proceedings, it actually had an opportunity to do that and it was to amend the claims. So that's why in this case, prohibiting amendment to a claim, which is basically what UTC is proposing, is even more compelling than in the Chef America vagabond systems cases because here, again, UTC had the opportunity to amend but it chose not to. Unless Your Honor has any questions, I have nothing more. Thank you. I suppose you have three minutes. Thank you, Your Honor. Your Honor, I have six brief points. Number one, the question of whether we preserved the issue on Hess and the multiple embodiments. The answer is opposite of what my colleague said. Yes, we did. It's at page 32 to 34 of the blue brief. The expert testimony is undisputed. There's equivocation by Dr. Abari but both Mattingly and Abari agreed that boundary condition means a speed limit, a maximum. With respect to the third point, the portions of Dr. Mattingly's testimony that was cited, I gave you the citations in answering Judge Toronto's questions, they are ample and there are a dozen of them. They simply took one out of context and ignored the balance. And to Dr. Abari's point that, well, it may be a design criteria condition but you can exceed it on emergency conditions. Well, actually, no, you can't. These engines are certified by the Federal Aviation Administration and Dr. Mattingly specifically testified that that type certification requires that the engine be operated within its design envelope and that's in the appendix at 5322, at paragraph 53. So even Dr. Abari's equivocation is unavailing. With respect to the meaningless limitation point, we do have a divergence of view between my colleague and me. They are arguing, well, it doesn't render the claim meaningless as a whole. With all due respect, that is not the law. We cite a number of cases in our brief that make it very clear that vitiation of a claim term deals with vitiation of that limitation. It doesn't require that the entire claim be rendered meaningless. This term construed the way the board apparently has construed it, would. No matter what speed you're going to operate on, the engine has to go at some point between zero and 1400 every time it's turned on and every time it's turned off. And there is no dispute about that fact. Dr. Abari agreed with that. But is there a dispute about whether that always happens when the other claim limitation is also met? No, Your Honor, because I think, well, there is under their view because they're saying we have to show that the entire claim is meaningless. That's not the law. The cases we cite in our brief make clear that it is vitiation of a limitation. It's the 1400 limitation that is being rendered meaningless. And that is what's improper. Finally, my colleague stated that we made admissions in related applications. This is just not true. The application he's referring to is not a related case. But it uses the same phrase, right? Sorry, Your Honor? It uses the same phrase. It uses the same phrase, but it's in a very different context. And what he ignores is the EPO application, which is a related application to this, in which the examiner made a similar rejection and we responded specifically that it is a maximum. So, if you're going to look to the other applications, I would suggest looking much more specifically at the EPO application. And the citation for that is in the appendix at 3364. And there's a statement there that we are saying very specifically that it is a maximum tip speed. Thank you, Your Honor. Unless the court has any other questions. No, thank you. Thank you very much.